# SENTENCING MEMORANDUM

*USA v. James Ciccone*
Docket No.: 1:07-CR-399

**GAIL GRAY**
*Attorney at Law*
770 Broadway - Second Floor
New York, New York 10003
(646) 495-6067
gail.gray@gmail.com

BY HAND DELIVERY

April 25, 2008

The Hon. Denise L. Cote
United States District Court Judge
Southern District of New York
500 Pearl Street
NY, NY 10007

    Re:   *United States of America v. James Ciccone*
          Docket No.: 07 CR 399-01 (DLC)

Your Honor:

In keeping with the statutory mandate to "impose a sentence sufficient but not greater than necessary" to advance the goals of punishment as well as account for Mr. Ciccone's unique circumstances and those of the offense, I ask that you favorably consider sentencing him to a term of probation which is not less than one nor more than five years 18 USC § 3553(a). [1] Despite the assertion of ineligibility contained in the Pre-Sentence Report (hereinafter, "PSR"), Mr. Ciccone's personal history of familial deprivation, racial injury and extreme self-sacrifice; the absence of personal enrichment attending the admitted offense; the absence of any prior criminal convictions; and the devastating collateral consequences he will suffer as a result of the instant conviction make him not only eligible but also a quintessential candidate for the rehabilitative promise of a probationary sentence, under *United States v. Booker*, 543 U.S. 220 (2005) and its progeny.

*The History and Characteristics of Mr. Ciccone*

When viewed in light of the Supreme Court's recent decisions in *United States v. Kimbrough*, 552 S. Ct. 558 (2007) and *United States v. Gall*, 552 S. Ct. 586 (2007), Mr. Ciccone's history and characteristics support a sentence outside the guideline range. As

---

[1] In a written plea agreement, dated November 7, 2007, the parties agreed that Mr. Ciccone may seek a sentence outside the Stipulated Guidelines Range, pursuant to 18 USC 3553(a).

Your Honor is aware, the *Kimbrough* decision does not eliminate reliance on the guideline calculations. It does, however, highlight the Supreme Court's previous insistence, in *United States v. Booker*, 543 U.S. 220 (2005), that the guideline calculations are merely advisory and serve as only one of several factors informing the decision whether a sentence is "not greater than necessary to accomplish the goals of sentencing."

In deciding this question, *Kimbrough* instructs sentencing courts to consider, among other things, "the nature and circumstances of the offense," as well as "the history and characteristics of the defendant." In *Gall*, decided the same day as *Kimbrough*, the Supreme Court indicated that sentencing courts must undertake an individualized assessment which necessarily includes consideration of these factors, as more fully set forth below [] [2]

Born fifty-three (53) years ago to very young, mixed-race parents and raised in the rural, racially homogeneous communities of central New York State, James Ciccone was regularly dislocated and disparaged. His family life was fractured and, during his formative years, family life was peripatetic. Parental immaturity, financial instability and domestic violence marred and eventually destroyed the family unit, resulting in constant flux.

After spending the first four years of his life in a household in Skaneateles, New York with parents who repeatedly argued and fought, he then moved with his mother and sister to Waterville, New York, where he lived with his maternal grandmother, herself married to a physically abusive man. During this time, his mother eked out an existence as a factory piece worker.

After two years, she met and married Mr. Ciccone's stepfather. The family then left the paternal grandmother's home to join the stepfather, an emotionally distant man, in his trailer. Determined to one day purchase a home of their own, the mother and stepfather worked long and hard in low paying positions. Their singular focus on this vision of domestic accomplishment, left Mr. Ciccone and his sister to fend for themselves. It was as though he and his sister lost their mother and biological father in one fell swoop. On the one hand, they were called upon to find a place for themselves within a narrative of newly wedded domesticity belonging to their mother and her new husband; on the other hand, their previous contact with their biological father was increasingly undermined by the mother's changed circumstance.

Alone for all practical purposes, Mr. Ciccone did his best to respond to playmates, classmates and neighbors who regularly and repeatedly referred to him as a "nigger" or other racially charged names. He fought back with his fists against ignorance and cruelty. In his youth, the challenges and complexities of race in America were unacknowledged. Tellingly, it was not until 2000 that the US Census even allowed respondents to declare two or more races. The historic presidential candidacy of Barack

---

[2] Brackets indicate the redaction of sensitive and confidential material, filed under seal, with the Court.

Obama has now inspired dialogue and encouraged the visibility of 7.3 million multiracial Americans. (See, "Being Multiracial in America," http://video.on.nytimes.com)  These advances aside, our continuing societal inability to grasp the nuances of race in America is evidenced by Mr. Ciccone's presumed designation as either "white" on the PSR or as "black" on the New York State Identification (NYSID) Sheet.

Despite having been consistently deprived of the essential and empowering sense of family and of racial identity and community, Mr. Ciccone perservered, finding a place for himself in academics and athletics.  He excelled as a student and as a soccer player, even though he was forced to repeatedly endure racially disparate treatment in the classroom and on the field.  For example, although he shined as a star soccer player in high school, his coach nevertheless secretly advised recruiters he was not interested in attending college, forcing the young Mr. Ciccone to independently contact colleges and negotiate terms of financial assistance.

Eventually, he secured a soccer scholarship to Colgate University.  Socially awkward, he made few friends but excellent grades, resulting in receipt of an academic scholarship to attend Albany Law School after attaining his bachelor's degree in three, instead of four, years.  After graduating as the only black student left standing, he accepted a position in Washington, D.C. at the Labor Department, where he rose to rank of Branch Chief.  His ambition to serve as a prosecutor in the United State Attorney's Office was frustrated when a competitor, Mr. Ciccone's underling in the Labor Department, was awarded the position.

After this defeat, Mr. Ciccone left Washington, D.C. for New York City, where he first secured a position prosecuting family offenses in Kings County Family Court and then, after several years, became a solo practitioner, representing the underserved communities of pre-gentrified Bedford Stuyvesant, Crown Heights and East New York.  Not surprisingly, his services were often provided on a *pro bono* and "low *bono"* basis or made available to entirely indigent clients through his membership in the assigned counsel plans of the New York City Family and Criminal Courts.  Tirelessly, he compiled a distinguished record of achievement as an advocate for members of this demographic.

Although Mr. Ciccone entered private practice in order to, among other things, assist others gain access to justice, he was unprepared to achieve this goal.  Unversed in the practical demands of running a law office, he was forced to perform not only as solitary practitioner but also as paralegal, process server, proofreader, receptionist, accountant, technology support person and the myriad of other roles required in a successful small business.  Besides making himself available to meet with clients, many of whom were the working poor, at their convenience, often after working long hours, he drafted pleadings, crafted  motions, delivered oral argument, negotiated settlements and dispositions, tried cases and prosecuted appeals.  When it became clear that he would also have to personally provide the clerical, lay and technical infrastructure for his practice, it was too late.  Having been socialized as a loner, which perfectly suits our common perception of the traditional lawyer who single-handedly develops and delivers winning arguments, Mr.

Ciccone was unable to reach out to others for the sustenance and support he needed to avoid going under. [3]

Pressing family matters were exacerbating the existing challenges to Mr. Ciccone's success in private practice. Now the father of three children, he sought to provide them with the only sources of strength he knew and understood: academic and athletic engagement. For example, once he realized his daughter evidenced promise as an ice skater, he saw to it that she joined a skating club and gained exposure to the rigors of training. Mr. Ciccone tearfully recounts his daughter's lost opportunity to excel as a figure skater because the mother was unwilling to join him in encouraging this aspect of her development.

Years later, Mr. Ciccone took his four year old son into the Eastern Athletic Club for swimming lessons but wound up astonished, along with coaches and other parents, by the child's natural talent with a tennis racket. Since then, Mr. Ciccone has selflessly dedicated himself to his son's athletic development and career. As noted in the accompanying report and the PSR, Mr. Ciccone not only researched the best coaches and training academies available but also investigated arrangements for his son's supervision and care while in training. When Mr. Ciconne's mother reneged on a promise to provide care, Mr. Ciccone himself divided his time between practice in New York and the Florida training academy where his son continued to demonstrate promise. Mr Ciccone was primarily, if not solely, responsible for the fees and expenses ensuring his son's future as a professional tennis player. Eventually, the physical, emotional and time commitments drained what was left of Mr. Ciccone's practice.

Complaints were lodged which Mr. Ciccone, overwhelmed and alone, did not timely answer. As a result, he was suspended, for a period of two years, from the practice of law. *Matter of Ciccone,* 276 A.D.2d 126 (2d Dept. 2000) Thereafter, additional complaints, several of which involved his failure to physically appear when required,

---

[3] In this regard, it is interesting that the *Incubator for Justice* project, a joint effort of the CUNY School of Law, New York City's premier public interest law school, and the Community Legal Resource Network (CLRN), recognizes and addresses precisely the challenges facing Mr. Ciccone, two decades ago, when he sought to offer legal services to disadvantaged communities. According to the CUNY School of Law website:

> The Incubator trains CLRN members, over an 18-month period, in basic business issues such as billing, record-keeping, technology, bookkeeping and taxes….The ultimate goal of both CLRN and the Incubator…[is] to make its members financially, professionally and personally successful, and help them achieve their individual justice missions. (http://www.law.cuny.edu/clinics/JusticeInitiatives/Community.html)

When interviewed for an article which appeared in the New York Times on January 9, 2008, Fred Rooney, Director of CLRN, had this to say about the Incubator project: "We're helping lawyers, and we're providing them with support and professional development skills, but it's all done with the goal of having them set up practices where access to justice is extremely limited." If Mr. Ciccone had the benefit of Incubator skills and training, then he might very well have accomplished his justice mission.

were filed. Findings against Mr. Ciccone resulted in an additional three year period of suspension. *Matter of Ciccone*, 293 A.D.2d 151 (2d Dept. 2002) Significantly, none of the complaints involved the mishandling of client funds. In 2003, he was disbarred from the practice of law and his name was stricken from the roll of attorneys and counselor-at-law. *Matter of Ciccone,* 307 A.D.2d 20 (2d Dept. 2003)

Despite the enormity of this loss and its attendant depression and humiliation, Mr. Ciccone has continued to devote himself to his son. They speak on the telephone every single day, sometimes two and three times a day, as father and son discuss tactics, strategies, homework and the spectrum of topics concerning an adolescent and his attentive father. Mr. Ciccone spends practically every penny he earns on his son in an effort to assure the equality of opportunity to which he is entitled, including equipment, training, travel and inclusion in tournaments and matches of moment. [4] As more fully set forth in the accompanying report, "extraordinary" best describes Mr. Ciccone's sacrifices on behalf of a child who has collected four national championships, including two doubles crowns and a team title and who captured the 2007 ATA National Championship in single matches between boys sixteen years old.

*The Nature and Circumstances of the Offense*

The instant offense arises, in large part, from the confluence of Mr. Ciccone's extreme attachment to his son and the habit, developed as child, of extreme self-reliance. Reeling from the loss of professional status, security and income but still responsible for the costs of his son's supervision, training and care with a well-regarded tennis coach in Atlanta Georgia, Mr. Ciccone acquired credit cards and cellular telephone accounts in his employer's name, without his employer's consent or knowledge.

Not surprisingly, the bulk of the unauthorized expenditures relate to his son's or his daughter's care. Mr. Ciccone did not directly enrich himself or purchase for himself a single item of substance or significance. Rather, the expenditure categories include tournament fees; tournament travel, housing and food; tennis equipment, like rackets, shoes and sneakers, and tennis outfits; cellphone communication with his out-of-state

---

[4] Unlike France, Spain and other countries around the world, the United States government has no federation or public funding available to support or finance promising young tennis players. Instead, Americans must rely entirely upon private funds to meet the annual costs of training, housing, educating and competition. These costs, of course, are quite high. The USTA junior development program offers relief for the training and competition expenses of a small number of youth who both attain a high national ranking by competing successfully in national tournaments and impress USTA coaches under other subjective criteria. However, this is a long, inexact process and not a practical solution for talented youth without adequate funding under pressure to meet the daily demands of training, because the very national tournaments which offer national ranking points and exposure are scattered across the country and require the expenditure of large resources in the first instance. In fact, with the exception of Lindsay Davenport, this process has succeeded in developing very few eventual professional champions. Conversely, the French government, for example, identifies talented youth at an early stage, and through the French federation, and programs like "Fete le Mur" (which literally translates as "Against the Wall") covers the training and development expenses of aspiring tennis players without taxing the limited resources of parents like Mr. Ciccone. (See www.usta.com, www.fft.fr.com, www.rfimusique.com)

son; car rentals; housing and temporary lodging [at Super 8 after the coach and his son were evicted from permanent housing]; medical expenses; books and other educational materials; clothing; entertainment for a child's consumption, like a trip to the Aquarium and ESPN Zone, attendance at an Atlanta Hawks basketball game, as well as visits to and purchases at The Apple Store. [5]

As set forth in the PSR [], Mr. Ciccone regrets his decision to charge his children's expenses to the unauthorized account of his employer.  He now recognizes that the childhood habit of forced self-sufficiency impaired his judgment and his empathy for a friend and former colleague.  He is tormented by his misguided and misconceived response to the crisis, characterizing it as a "horrible mistake."  He has consistently indicated it was his intention to remain accountable for the charges, as he would have been had he simply explained the circumstances and asked for payment in advance of work soon to be performed.

*The Need for the Sentence Imposed*

[]

In this way, Mr. Ciccone will receive "needed medical care…in the most effective manner," as statutorily required by 18 USC § 3553(a)(2)(D), without fracturing the close relationship between father, son and daughter or disrupting the son's development as an athlete with a promising tennis career which his father is best positioned to oversee, as he has for the last twelve years.

In closing, I emphasize the dire collateral consequences Mr. Ciccone will suffer as a result of his fraud conviction.  For all practical purposes, he is forever precluded from having his name returned to the roll of attorneys and counselors-at-law.  Additionally, he will endure stigma, civil isolation and innumerable restrictions on social and economic advancement, including occupational bars and licensing restrictions.  When coupled with the imposition of a sentence of probation, these "invisible punishments" adequately reflect the seriousness of the crime and deter future criminal conduct (www.sentencingproject.org).

Thank you for your consideration.


Respectfully submitted,



Gail Gray

---

[5] There are also expenses related to Mr. Ciccone's daughter, specifically clothing and tuition for The Dance Theater of Harlem.